ON PETITION FOR REHEARING
Mrs. Fannie Traylor Moses died on February 6, 1967. An instrument, dated December 23, 1957 and purporting to be her last will and testament, was duly admitted to probate in common form in the Chancery Court of the First Judicial District of Hinds County. Thereafter, on February 14, 1967, appellant, Clarence H. Holland, an attorney at law, not related to Mrs. Moses, filed a petition in that court tendering for probate in solemn form, as the true last will and testament of Mrs. Moses, a document dated May 26, 1964, under the terms of which he would take virtually her entire estate. This document contained a clause revoking former wills and Holland's petition prayed that the earlier probate of the 1957 will be set aside.
The beneficiaries under the 1957 will (the principal beneficiary was an elder sister of Mrs. Moses) responded to Holland's petition, denied that the document tendered by him was Mrs. Moses' will, and asserted, among other things, that it was (1) the product of Holland's undue influence upon her, (2) that at the time of its signing, Mrs. Moses lacked testamentary capacity, and, (3) that the 1957 will was Mrs. Moses' true last will and testament and its probate should be confirmed. By cross bill, respondents prayed that Holland's apparent ownership of an interest in certain real estate had been procured by undue influence and that it should be cancelled as a cloud upon the title of Mrs. Moses, the true owner.
By agreement, the case was heard by the chancellor without a jury.
After hearing and considering a great deal of evidence, oral and documentary, together with briefs of counsel, the chancellor, in a carefully considered opinion, found that (1) the 1964 document, tendered for probate by Holland, was the product of undue influence and was not entitled to be admitted to probate, (2) the earlier probate of the 1957 will should be confirmed and, (3) Mrs. Moses had been the true owner of the interest claimed by Holland in the real estate and his claim of ownership should be cancelled as a cloud upon the title of Mrs. Moses.
Holland's appeal is from the decree entered denying probate to the 1964 document and cancelling his claim to an undivided one-half interest in the real estate.
A number of grounds are assigned for reversal. However, appellant's chief argument is addressed to the proposition that even if Holland, as Mrs. Moses' attorney, occupied a continuing fiduciary relationship with respect to her on May 26, 1964, the date of the execution of the document under which he claimed her estate, the presumption of undue influence was overcome because, in making the will, Mrs. Moses had the independent advice and counsel of one entirely devoted to her interests. It is argued that, for this reason, a decree should be entered here reversing the chancellor and admitting the 1964 will to probate. The question as to the land would then become moot as Holland would take it under the residuary clause of the 1964 will.
A brief summary of facts found by the chancellor and upon which he based his conclusion that the presumption was not overcome, follows:
Mrs. Moses died at the age of 57 years, leaving an estate valued at $125,000. She had lost three husbands in less than 20 years. Throughout the latter years of her life her health became seriously impaired. She suffered from serious heart trouble and cancer had required the surgical removal of one of her breasts. For 6 or 7 years preceding her death she was an alcoholic.
On several occasions Mrs. Moses had declared her intention of making an elder sister her testamentary beneficiary. She had once lived with this sister and was grateful *Page 832 
for the many kindnesses shown her. Mrs. Moses' will of December 23, 1957 did, in fact, bequeath the bulk of her estate to this sister.
The exact date on which Holland entered Mrs. Moses' life is unclear. There is a suggestion that she had met him as early as 1951. Their personal relationship became what the chancellor, somewhat inaccurately, characterized, as one of "dubious" morality. The record, however, leaves no doubt as to its nature. Soon after the death of Mrs. Moses' last husband, Holland, although 15 years her junior, began seeing Mrs. Moses with marked regularity, there having been testimony to the effect that he attended her almost daily. Holland was an attorney and in that capacity represented Mrs. Moses. She declared that he was not only her attorney but her "boyfriend" as well. On August 22, 1961, a date during the period in which the evidence shows that Holland was Mrs. Moses' attorney, she executed a document purporting to be her will. This instrument was drawn by an attorney with whom Holland was then associated and shared offices, and was typed by a secretary who served them both. It was witnessed by Holland's associate and their secretary. In addition to other testamentary dispositions, this document undertook to bequeath to Holland "my wedding ring, my diamond solitare ring and my three gold bracelets containing twenty-five (25) pearls each." In it Holland is referred to as "my good friend." The validity of this document is not an issue in the present case.
After Mrs. Moses died, the 1964 will was brought forward by another attorney, also an associate of Holland, who said that it had been entrusted to him by Mrs. Moses, together with other papers, for safekeeping. He distinguished his relation with Holland from that of a partner, saying that he and Holland only occupied offices together and shared facilities and expenses in the practice of law. He also stated that he saw Mrs. Moses on an "average" of once a week, most often in the company of Holland.
Throughout this period, Mrs. Moses was a frequent visitor at Holland's office, and there is ample evidence to support the chancellor's finding that there existed a continuing fiduciary relationship between Mrs. Moses and Holland, as her attorney.
In May, 1962, Holland and the husband of Holland's first cousin, one Gibson, had contracted to buy 480 acres of land for $36,000. Mrs. Moses was not, it appears, originally a party to the contract. Gibson paid the $5,000 earnest money but testified that he did not know where it had come from and assumed that it came from Mrs. Moses. At the time, Mrs. Moses had annuity contracts with a total maturity value of some $40,000 on which she obtained $31,341.11. This sum was deposited in a bank account called "Cedar Hills Ranch." She gave Holland authority to check on this account, as well as upon her personal account. About this time, Gibson disappeared from the land transaction. On June 7, 1962, the deal was closed. At closing, the persons present, in addition to the grantors and their agents and attorney, were Mrs. Moses and Holland, her attorney. Mrs. Moses had no other counsel. Holland issued a check on the Cedar Hills Ranch account (in which only Mrs. Moses had any money) for the $31,000 balance. Although none of the consideration was paid by Holland, the deed from the owners purported to convey the land to Holland and Mrs. Moses in equal shares, as tenants in common. On the day following, Holland issued another check on the Cedar Hills Ranch account (in which he still had deposited no money) for $835.00 purportedly in payment for a tractor. This check was issued by Holland to his brother. Eight days later Holland drew another check on this account for $2,100.00 purportedly for an undisclosed number of cattle. This check was issued to Holland's father.
The evidence supports the chancellor's finding that the confidential or fiduciary relationship which existed between Mrs. Moses and Holland, her attorney, was a subsisting and continuing relationship, *Page 833 
having begun before the making by Mrs. Moses of the will of August 22, 1961, under the terms of which her jewelry had been bequeathed to Holland, and having ended only with Mrs. Moses' death. Moreover, its effect was enhanced by the fact that throughout this period, Holland was in almost daily attendance upon Mrs. Moses on terms of the utmost intimacy. There was strong evidence that this aging woman, seriously ill, disfigured by surgery, and hopelessly addicted to alcoholic excesses, was completely bemused by the constant and amorous attentions of Holland, a man 15 years her junior. There was testimony too indicating that she entertained the pathetic hope that he might marry her. Although the evidence was not without conflict and was, in some of its aspects, circumstantial, it was sufficient to support the finding that the relationship existed on May 26, 1964, the date of the will tendered for probate by Holland.
The chancellor's factual finding of the existence of this relationship on that date is supported by evidence and is not manifestly wrong. Moreover, he was correct in his conclusion of law that such relationship gave rise to a presumption of undue influence which could be overcome only by evidence that, in making the 1964 will, Mrs. Moses had acted upon the independent advice and counsel of one entirely devoted to her interest.
Appellant takes the position that there was undisputed evidence that Mrs. Moses, in making the 1964 will, did, in fact, have such advice and counsel. He relies upon the testimony of the attorney in whose office that document was prepared to support his assertion.
This attorney was and is a reputable and respected member of the bar, who had no prior connection with Holland and no knowledge of Mrs. Moses' relationship with him. He had never seen nor represented Mrs. Moses previously and never represented her afterward. He was acquainted with Holland and was aware that Holland was a lawyer.
A brief summary of his testimony, with respect to the writing of the will, follows:
Mrs. Moses had telephoned him for an appointment and had come alone to his office on March 31, 1964. She was not intoxicated and in his opinion knew what she was doing. He asked her about her property and "marital background." He did this in order, he said, to advise her as to possible renunciation by a husband. She was also asked if she had children in order to determine whether she wished to "pretermit them." As she had neither husband nor children this subject was pursued no further. He asked as to the values of various items of property in order to consider possible tax problems. He told her it would be better if she had more accurate descriptions of the several items of real and personal property comprising her estate. No further "advice or counsel" was given her.
On some later date, Mrs. Moses sent in (the attorney did not think she came personally and in any event he did not see her), some tax receipts for purposes of supplying property descriptions. He prepared the will and mailed a draft to her. Upon receiving it, she telephoned that he had made a mistake in the devise of certain realty, in that he had provided that a relatively low valued property should go to Holland rather than a substantially more valuable property which she said she wanted Holland to have. He rewrote the will, making this change, and mailed it to her, as revised, on May 21, 1964. On the one occasion when he saw Mrs. Moses, there were no questions and no discussion of any kind as to Holland being preferred to the exclusion of her blood relatives. Nor was there any inquiry or discussion as to a possible client-attorney relationship with Holland. The attorney-draftsman wrote the will according to Mrs. Moses' instructions and said that he had "no interest in" how she disposed of her property. He testified "I try to draw the will to suit their purposes and if she (Mrs. *Page 834 
Moses) wanted to leave him (Holland) everything she had, that was her business as far as I was concerned. I was trying to represent her in putting on paper in her will her desires, and it didn't matter to me to whom she left it * * * I couldn't have cared less."
When Mrs. Moses returned to the office to execute the will, the attorney was not there and it was witnessed by two secretaries. One of these secretaries, coincidentally, had written and witnessed the 1961 will when working for Holland and his associate.
The attorney's testimony supports the chancellor's finding that nowhere in the conversations with Mrs. Moses was there touched upon in any way the proposed testamentary disposition whereby preference was to be given a nonrelative to the exclusion of her blood relatives. There was no discussion of her relationship with Holland, nor as to who her legal heirs might be, nor as to their relationship to her, after it was discovered that she had neither a husband nor children.
It is clear from his own testimony that, in writing the will, the attorney-draftsman, did no more than write down, according to the forms of law, what Mrs. Moses told him. There was no meaningful independent advice or counsel touching upon the area in question and it is manifest that the role of the attorney in writing the will, as it relates to the present issue, was little more than that of scrivener. The chancellor was justified in holding that this did not meet the burden nor overcome the presumption.
In Croft v. Alder, 237 Miss. 713, 724, 115 So.2d 683, 686 (1959) there was an extensive review of the authorities relating to the question here under consideration. This Court said:
 Meek v. Perry, 1858, 36 Miss. 190, 243, 244, 252, 259, is perhaps the leading case. It involved a will by a ward leaving a substantial amount of her property to her guardian. The Court held that the presumption of invalidity applies to wills as well as deeds. It was said the law watches with the greatest jealously transactions between persons in confidential relations and will not permit them to stand, unless the circumstances demonstrate the fullest deliberation on the part of the testator and the most abundant good faith on the part of the beneficiary. Hence the law presumes the existence of undue influence, and such dealings are prima facie
void, and will be so held "unless the guardian show by clearest proof" that he took no advantage over the testator, and the cestui's act was a result of his own volition and upon the fullest deliberation. * * *
 Moreover, even where there is no presumption of undue influence, the burden of proof rests upon the proponents throughout and never shifts to the contestants, both on undue influence and mental incapacity. Cheatham v. Burnside, 1954, 222 Miss. 872, 77 So.2d 719. From its very nature, evidence to show undue influence must be largely circumstantial. Undue influence is an intangible thing, which only rarely is susceptible of direct or positive proof. As was stated in Jamison v. Jamison, 1909, 96 Miss. 288, 51 So. 130, "the only positive and affirmative proof required is of facts and circumstances from which the undue influence may be reasonably inferred." * * *
 The able and respected attorney who prepared the will upon data furnished him by Barney, who stated he was acting for Mr. Alder, testified that, in his opinion, the testator was mentally competent and the instrument reflected testator's independent purpose. However, the record indicates that the witness had not conferred with Mr. Alder about the will prior to its drafting. Moreover, his testimony does not negative the presumption of undue influence resulting from "antecedent agencies" and prior actions by the principal beneficiary who was in the confidential relation. In Jamison v. Jamison, *Page 835 
1909, 96 Miss. 288, 298, 51 So. 130, 131, it was said: "The difficulty is also enhanced by the fact, universally recognized, that he who seeks to use undue influence does so in privacy. He seldom uses brute force or open threats to terrorize his intended victim, and if he does he is careful that no witnesses are about to take note of and testify to the fact. He observes, too, the same precautions if he seeks by cajolery, flattery, or other methods to obtain power and control over the will of another, and direct it improperly to the accomplishment of the purpose which he desires. Subscribing witnesses are called to attest the execution of wills, and testify as to the testamentary capacity of the testator, and the circumstances attending the immediate execution of the instrument; but they are not called upon to testify as to the antecedent agencies by which the execution of the paper was secured, even if they had any knowledge of them, which they seldom have." In re Coins' Will (Fortner v. Coins), 1959, [237 Miss. 322] 114 So.2d 759.
 We do not think that the testimony of the attorney who attested the will, as to his observations at that particular time, can suffice to rebut the already existing presumption. As stated in Jamison, he naturally would have had no knowledge of any precedent activities by Barney. (emphasis added).
In Croft, supra, this Court quoted the rule as stated in 57 Am.Jur. Wills sections 389, 390 as follows:
 * * * [A]lthough the mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary exercised undue influence over the testator, as it does with gifts inter vivos, such consequence follows where the beneficiary "has been actively concerned in some way with the preparation or execution of the will, or where the relationship is coupled with some suspicious circumstances, such as mental infirmity of the testator;" * * * (emphasis added).
See also Young v. Martin, 239 Miss. 861, 125 So.2d 734,126 So.2d 529 (1961).
Holland, of course, did not personally participate in the actual preparation or execution of the will. If he had, under the circumstances in evidence, unquestionably the will could not stand. It may be assumed that Holland, as a lawyer, knew this.
In Croft, supra, this Court said that the presumption of undue influence in the production of a will may arise from "antecedent circumstances" about which its draftsman and the witnesses knew nothing. The rule, as stated in that case, is that undue influence will be presumed where the beneficiary "has been actively concerned in some way with the preparation or execution of the will, or where the relationship is coupled with somesuspicious circumstances, such as mental infirmity of the testator." (emphasis added).
Undue influence operates upon the will as well as upon the mind. It is not dependent upon a lack of testamentary capacity.
The chancellor's finding that the will was the product of Holland's undue influence is not inconsistent with his conclusion that "Her (Mrs. Moses) mind was capable of understanding the essential matters necessary to the execution of her will on May 26, 1964, at the time of such execution." A weak or infirm mind may, of course, be more easily over persuaded. In the case under review, Mrs. Moses was in ill health, she was an alcoholic, and was an aging woman infatuated with a young lover, 15 years her junior, who was also her lawyer. If this combination of circumstances cannot be said to support the view that Mrs. Moses suffered from a "weakness or infirmity" of mind, vis-a-vis Holland, it was hardly calculated to enhance her power of will where he was concerned. Circumstances *Page 836 
in evidence, both antecedent and subsequent to the making of the will, tend to accord with that conclusion.
The sexual morality of the personal relationship is not an issue. However, the intimate nature of this relationship is relevant to the present inquiry to the extent that its existence, under the circumstances, warranted an inference of undue influence, extending and augmenting that which flowed from the attorney-client relationship. Particularly is this true when viewed in the light of evidence indicating its employment for the personal aggrandizement of Holland. For that purpose, it was properly taken into consideration by the chancellor.
In 94 C.J.S. Wills § 253 (1956) it is stated:
 The mere existence of illicit, improper, unlawful, or meretricious relations between the testator and the beneficiary or the beneficiary's mother is insufficient of itself to prove fraud or undue influence, although the existence of such relations is an important fact to be considered by the jury along with other evidence of undue influence, giving to other circumstances a significance which they might not otherwise have; and much less evidence will be required to establish undue influence on the part of one holding wrongful and meretricious relations with the testator.
In Croft and Taylor, supra, the beneficiary was present at or participated at some stage or in some way in the preparation or execution of the will. However, it is to be noted that it was the "antecedent circumstances" which gave rise to the presumption of undue influence, and that this was not overcome by testimony of an independent lawyer-draftsman who testified that the will reflected the independent wishes of the testator who had been of sound mind and had known what he was doing.
The rule laid down in Croft, supra, would have little, if any, practical worth, if, under circumstances such as those established in this case, it could be nullified by a mere showing that the beneficiary was not physically present when the will was prepared and executed.
The rule that where a fiduciary relationship has been established, a presumption of undue influence arises, is not limited to holographs, nor confined to wills otherwise prepared by the testator himself. It encompasses with equal force wills written for the testator by a third person. There is no sound reason supporting the view that a testator, whose will has become subservient to the undue influence of another, is purged of the effects of that influence merely because the desired testamentary document is prepared by an attorney who knows nothing of the antecedent circumstances.
The chancellor was justified in finding that the physical absence of Holland during Mrs. Moses' brief visit to the office of the attorney who wrote the will did not suffice to abate or destroy the presumption of undue influence.
The chancellor was the judge of the credibility of the witnesses and the weight and worth of their testimony. Moreover, as trier of facts, it was for him to resolve conflicts and to interpret evidence where it was susceptible of more than one reasonable interpretation. It was also his prerogative to draw reasonable inferences from facts proved. As said in Croft,supra, "[T]he only positive and affirmative proof required is of facts and circumstances from which the undue influence may be reasonably inferred." This Court, in passing upon the sufficiency of the evidence to support the factual findings of the chancellor, must accept as true all that the evidence proved or reasonably tended to prove, together with all reasonable inferences to be drawn from it, supporting such findings.
Viewed in the light of the above rules, it cannot be said that the chancellor was manifestly wrong in finding that Holland occupied a dual fiduciary relationship with respect *Page 837 
to Mrs. Moses, both conventional and actual, attended by suspicious circumstances as set forth in his opinion, which gave rise to a presumption of undue influence in the production of the 1964 will, nor that he was manifestly wrong in finding that this presumption was not overcome by "clearest proof" that in making and executing the will Mrs. Moses acted upon her "own volition and upon the fullest deliberation," or upon independent advice and counsel of one wholly devoted to her interest.
Other grounds assigned by appellant as requiring reversal and retrial, are that: (1) there was a waiver of Holland's incompetency as a witness and (2) the issue as to Holland's claim to an interest in the land should not have been heard or decided.
The first of these, that there was a waiver of Holland's incompetency to testify as a witness to establish his claim or defense against the estate of a deceased person, is predicated upon two propositions. It is asserted that: (a) a waiver occurred when appellee obtained pretrial inspection of documents in Holland's possession, including his income tax returns, bank statements, and other papers and used them in evidence, and (b) if mistaken in that contention, an express waiver occurred, when, an objection to allowing Holland to testify as a witness having been sustained theretofore, a written statement of what Holland's testimony would have been if he had been permitted to testify was sought to be introduced over the objection of appellees.
Holland was incompetent to testify under Mississippi Code 1942 Annotated section 1690 (1956).
The contention that pretrial inspection and use in evidence of papers in Holland's possession constituted a waiver of his incompetency as a witness under the statute has been answered in the negative by this Court in at least two cases. Martin v. Martin's Estate, 217 Miss. 173, 63 So.2d 827 (1953) and Veazey v. Turnipseed, 219 Miss. 559, 69 So.2d 379 (1954).
In arguing the second facet of the contention that there was a waiver of Holland's incompetency, appellant relies upon a remark by counsel for appellees made in the course of the trial, near the close of appellant's presentation of his case in chief, when a previously prepared written document, containing a statement of what Holland's testimony would be if he were permitted to testify, was sought to be introduced by appellant over the objection of appellees. When this document was offered there ensued an extended colloquy between the court and counsel for both sides. When it appeared that there was a possibility that the court might admit the statement, described by appellees as wholly "self serving," counsel for appellees continued strenuously to object, claiming that the introduction of the statement was an effort on Holland's part to circumvent the statute and by this means to get his testimony before the court. Counsel's position was that, if this were done, he would withdraw his previous objection to Holland as a witness in order that he might be afforded the privilege of cross examination. When the court ruled that the written statement would not be admitted, counsel for appellees stated that, in view of the court's ruling, the objection to Holland as a witness would not be withdrawn. The record clearly shows that what actually happened during this colloquy between the court and counsel was that counsel for appellees apprehended that the court might admit Holland's written statement, and proposed to withdraw the objection for purposes of cross examination in that event. This eventuality not having occurred, the objection was not withdrawn. Apparently, at the time, appellant's counsel did not consider the objection withdrawn, as Holland was not again offered as a witness. There is no merit in the contention that this constituted an irrevocable waiver of Holland's incompetency.
Nor is there merit in appellant's contention that the court should neither have heard nor decided the issue relating to Holland's apparent claim of an interest *Page 838 
in the land purchased by Mrs. Moses. Mississippi Code 1942 Annotated section 1307 (1956) provides in part:
 * * * [T]he uniting in one bill of several distinct and unconnected matters of equity against the same defendants shall not be an objection to the bill.
In this case, although there were others who necessarily were made parties, the only issues litigated were with Holland. However, it is unnecessary to decide whether the present case falls within the quoted provision of section 1307 for the reason that appellees' cross bill specifically sought cancellation of Holland's claim to an interest in the land and, as to this, Holland's responsive pleadings joined issue. Appellant did not challenge the propriety of the determination of that issue by demurrer or otherwise. The case was tried and the entire matter heard, concluded and decided and this question was not raised by Holland at any time during the trial. The question may not be raised here for the first time. Ford v. United Gas Corp.,254 F.2d 817 (5th Cir.); cert. denied, 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64 (1958), Sansing v. Thomas, 211 Miss. 727, 52 So.2d 478
(1951) and Parkinson v. Mills, 172 Miss. 784, 159 So. 651 (1935).
As stated in Croft, supra, the rule that a presumption of undue influence arises when a fiduciary relationship is established applies with even greater stringency in cases of transactions inter vivos. In the land transaction, Holland attended as Mrs. Moses' attorney. She had no other advice or counsel. The chancellor correctly held that, under the circumstances, Holland, as her attorney, could take no interest adverse to Mrs. Moses in the land purchased by her. He took title to the half interest in the land as trustee for Mrs. Moses and not otherwise. His apparent claim of ownership of a half interest was properly cancelled and removed as a cloud upon the title of Mrs. Moses to the complete fee. Johnson v. Outlaw, 56 Miss. 541
(1879) and Cameron v. Lewis, 56 Miss. 601 (1879). See also
Sojourner v. Sojourner, 247 Miss. 342, 153 So.2d 803, 156 So.2d 579 (1963) and Smith v. Dean, 240 S.W.2d 789 (Tex.Civ.App.) (1951).
For the foregoing reasons, the petition for rehearing is sustained, the original majority opinion is withdrawn, this opinion will be that of the Court, and the decree of the chancery court will be affirmed.
Petition for rehearing sustained, original opinion withdrawn, and decree of chancery court affirmed.
ETHRIDGE, C.J., and GILLESPIE, RODGERS and JONES, JJ., concur.
BRADY, PATTERSON, INZER and ROBERTSON, JJ., dissent.